UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**BNSF RAILWAY COMPANY,**

   Plaintiff,

v.                                No. 4:21-cv-0432-P

**INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS – TRANSPORTATION DIVISION,**

   Defendant.

## MEMORANDUM OPINION & ORDER

"It's *déjà vu* all over again"—a railway company, a labor union, and of course, a dispute between the two.[1] This case presents the oft-litigated issue of whether a particular conflict is either a "major" or "minor" dispute under the Railway Labor Act ("RLA"). Specifically, at issue is whether it is a major or minor dispute for Plaintiff BNSF Railway Company ("BNSF") to require its road-service employees to use company vehicles in the performance of their duties.

BNSF argues that the dispute is minor while Defendant International Association of Sheet Metal, Air, Rail and Transportation Workers – Transportation Division ("SMART-TD") argues that it is major. To those ends, the Parties filed Cross-Motions for Summary Judgment seeking declaratory judgments adopting their respective positions. ECF Nos. 27, 30. As explained below, the Court will **GRANT in part** BNSF's Motion for Summary Judgment and **DENY** SMART-TD's Motion for Summary Judgement.

---

[1] YOGI BERRA, THE YOGI BOOK: "I REALLY DIDN'T SAY EVERYTHING I SAID!" 45 (1999).

## FACTUAL BACKGROUND

### A. The Parties

BNSF is a common carrier engaged in interstate commerce and headquartered in Fort Worth, Texas. ECF No. 1; *see also* 45 U.S.C. § 151 First (defining "carrier" under the RLA). And SMART-TD, formerly United Transportation Union, is the duly authorized representative of the crafts or classes of train-service employees employed by BNSF. ECF No. 24; *see also* 45 U.S.C. § 151 Sixth (defining "representative" labor organization under the RLA).

### B. The Agreement

BNSF and SMART-TD have entered into several collective bargaining agreements governing the terms and conditions of employment for train-service employees. One such agreement is the "1985 National Agreement" ("National Agreement").[2] Relevant to the instant dispute is Article VIII of the National Agreement, which governs work requirements for both road and yard crews.[3] Article VIII provides, in relevant part:

> **Section 1 – Road Crews**
>
> Road crews may perform the following work in connection with their own trains without additional compensation:
>
> (a) Get or leave their train at any location within the initial and final terminals and handle their own switches. When a crew is required to report for duty or is relieved from duty at a point other than the on and off duty point fixed for that assignment and such point

---

[2]The National Agreement was reached between the National Carriers' Conference Committee and the United Transportation Union. Because BNSF is a member of the National Carriers' Conference Committee and the United Transportation Union is SMART-TD's predecessor, the Parties do not dispute that the National Agreement governs.

[3]As the Court understands the industry-specific terms, yard-service employees typically work within a single rail yard's "switching limits," which is the geographical limit of a rail yard and can cover an area miles outside the boundaries of a switching yard. Road-service employees work primarily outside of a rail yard and are involved in the transportation of trains from one yard to another over long distances.

2

is not within reasonable walking distance of the on and off duty point, transportation will be provided.

. . . .

**Section 3 – Incidental Work**

(a) Road and yard employees in ground service and qualified engine service employees may perform the following items of work in connection with their own assignments without additional compensation:

    (1) Handle switches
    (2) Move, turn and spot locomotives and cabooses
    (3) Supply locomotives and cabooses except for heavy equipment and supplies generally placed on locomotives and cabooses by employees of other crafts
    (4) Inspect cars
    (5) Start or shutdown locomotives
    (6) Bleed cars to be handled
    (7) Make walking and rear-end air tests
    (8) Prepare reports while under pay
    (9) Use communication devices; copy and handle train orders, clearances and/or other messages
    (10) Any duties formerly performed by firemen.

(b) Road and yard employees in engine service and qualified ground service employees may perform the following items of work in connection with their won assignments without additional compensation:

    (1) Handle switches
    (2) Move, turn, spot and fuel locomotives
    (3) Supply locomotives except for heavy equipment and supplies generally placed on locomotives by employees of other crafts
    (4) Inspect locomotives
    (5) Start or shutdown locomotives
    (6) Make head-end air tests
    (7) Prepare reports while under pay
    (8) Use communication devices; copy and handle train orders, clearances and/or other messages
    (9) Any duties formerly performed by firemen.

### Section 4 – Construction of Article

> Nothing in this Article is intended to restrict any of the existing rights of a carrier.

ECF Nos. 29 at 12–14; 32 at 6–8.

**C. The Dispute**

The instant dispute began roughly three years ago when BNSF informed SMART-TD that it intended to start requiring certain union-represented employees to drive company vehicles in the performance of their duties. SMART-TD objected to the proposed driving policy, arguing that BNSF could not require union-represented employees to drive company vehicles under the National Agreement. To resolve these differences, the Parties exchanged draft proposals that, if agreed to, would have governed union-represented employees driving company vehicles in the performance of their duties. *See* ECF No. 32 at 15–16, 19–20. However, the negotiations were fruitless, and the Parties failed to reach an agreement. Nonetheless, BNSF implemented its plan requiring union-represented employees to drive company vehicles in the performance of their duties. To date, BNSF has been requiring union-represented employees to drive themselves to and from their trains in various locations.[4] ECF Nos. 29 at 10; 32 at 4.

The Parties (unsurprisingly) disagree about how to classify this dispute regarding BNSF's contested driving policy. However, the Parties (surprisingly) disagree about what the instant dispute encompasses.

On one hand, BNSF's filings focus on both yard- *and* road-service employees—seeking, *inter alia*, a declaratory judgment that the Parties' dispute over whether train-service employees can be required to drive

---

[4]SMART-TD asserts that road-service employees are also required to drive company vehicles to and from their lodging. The proposal, however, explicitly states that the "[v]ehicle[s] will not be used for travel to and from lodging." ECF No. 32 at 22. Further, BNSF flatly rejected that they are (currently) requiring road-service crews to drive company vehicles to and from lodging. *See* ECF No. 40 at 42 ("They're not driving to and from lodging. They're driving in connection with their trains during their tour of duty to go help."). Accordingly, the Court does not consider road-service employees driving company vehicles to and from lodging to be a part of the contested driving policy that is before the Court.

4

themselves to their work (rather than be chauffeured to and from those sites) is minor. *See* ECF No. 1.

On the other hand, SMART-TD's filings focus *only* on *road*-service employees—seeking, *inter alia*, a declaratory judgment that requiring road-service employees to drive vehicles during the performance of their duties violates BNSF's obligations under the RLA. *See* ECF No. 24.

The Parties clarified this disagreement at the hearing on the Cross-Motions for Summary Judgment.[5] *See* ECF No. 40. Accordingly, based on the Parties' representations, the central issue is whether it is a major or minor dispute for BNSF to require its *road*-service employees to drive company vehicles in the performance of their duties.

## PROCEDURAL HISTORY

On March 12, 2021, BNSF filed this civil action seeking declaratory and injunctive relief against SMART-TD. ECF No. 1. BNSF then filed a Motion for a Temporary Restraining Order and/or Preliminary Injunction ("Motion") on March 16, 2021. ECF Nos. 7–8. Because there was no imminent threat of a strike, the Court denied the Motion. ECF No. 17. On June 7, 2021, SMART-TD answered the Complaint and asserted a counterclaim seeking declaratory and injunctive relief against BNSF. ECF No. 24. After failing to resolve their differences at mediation, the Parties filed Cross-Motions for Summary Judgment. *See* ECF Nos. 27, 30. The Court held a hearing on the Cross-Motions for Summary Judgment, *see* ECF No. 40, which are now ripe for review.

## LEGAL STANDARD

### A. Summary Judgment Standard

Summary judgment is appropriate where the movant demonstrates "there is no genuine dispute as to any material fact and the movant is

---

[5] SMART-TD concedes that the contested driving policy—as applied to *yard*-service employees—is a minor dispute. ECF No. 40 at 9–10. The Court therefore analyzes whether the contested driving policy—as applied to *road*-service employees—is either a major or minor dispute. Narrowing the controversy before the Court to entail only road-service employees does not alter the Court's analysis, and SMART-TD's concession regarding yard-service employees does not go towards the merits. Instead, that concession merely acknowledges that whether BNSF can require yard-service employees to drive a company vehicle is a decision left for an arbitrator—not the Court.

5

entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham."). To demonstrate an issue as to material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must show sufficient evidence to resolve issues of material fact in its favor. *Anderson*, 477 U.S. at 249.

When evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *Id.* at 255. However, it is not incumbent upon the Court to comb through the record in search of evidence that creates a genuine issue as to a material fact. *See Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). The nonmoving party must cite the evidence in the record that establishes the existence of genuine issues as to the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Finally, when parties file cross motions for summary judgment, the court "review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *See, e.g.*, *Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 224 (5th Cir. 2020) (quoting *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014)).

### B. The Railway Labor Act

"[R]elations between railroads and their workers have often been stormy." *Burlington N. & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Emps.*, 143 F. Supp. 2d 672, 678 (N.D. Tex. 2001) (McBryde, J.). "As another judge noted, 'the origins of this matter (as well as many other disputes) can probably be traced back prior to 1894, when Eugene V. Debs led members of the American Railway Union in a turbulent strike against the Pullman Palace Car Company of Illinois.'" *Id.* (quoting *Alton & S. Ry. Co. v. Bhd. of Maint. of Way Emps.*, 883 F. Supp. 755, 756 (D.D.C. 1995); *see also* 1 HARRY S. TRUMAN, MEMOIRS BY HARRY S.

TRUMAN: YEAR OF DECISIONS 500–02 (1995) (discussing the "drastic measures" that might be necessary to quash railroad labor disputes).

Accordingly, the "major purpose of Congress in passing the Railway Labor Act was 'to provide a machinery to prevent strikes'" in order to "safeguard the vital interests of the country" in uninterrupted rail service. *Texas & N. O. R.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 565 (1930); *see also* 45 U.S.C. § 151a. At the "heart of the [RLA]," *Atlanta & W. Point R. Co. v. United Transp. Union*, 439 F.2d 73, 77 (5th Cir. 1971), is the "duty of all carriers . . . and employees to exert every reasonable effort to make and maintain agreements . . . and to settle all disputes . . . between the carrier and the employees thereof." 45 U.S.C. § 152 First. To that end, the RLA sets out a mandatory and "virtually endless" process of "negotiation, mediation, voluntary arbitration, and conciliation." *Burlington N. R.R. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 444 (1987).

In the railroad industry, labor disputes have traditionally fallen into two distinct categories: those that are "major" and those that are "minor." *Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 302–04 (1989) ("*Conrail*"). Accordingly, the RLA adopted the phrases "major" and "minor" as "terms of art." *Bhd. of Locomotive Eng'rs & Trainmen (Gen. Comm. of Adjustment, Cent. Region) v. Union Pac. R.R. Co.*, 879 F.3d 754, 757 (7th Cir. 2017).

Major disputes find their statutory basis in 45 U.S.C. § 152 Seventh and 45 U.S.C. § 156; they "relate[] to disputes over the formation of collective agreements or efforts to secure them." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945). Stated another way: In a major dispute, the "issue is not whether an existing agreement controls the controversy." *Id.* Rather, major disputes "arise where there is no such agreement or where it is sought to change the terms of one," *id.*, and "[t]hey look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 435 (5th Cir. 2021) (quoting *Elgin*, 325 U.S. at 723).

Minor disputes are based on 45 U.S.C. § 152 Sixth and 45 U.S.C. § 153 First; they "relate either to the meaning or proper application of a

7

particular provision" with reference to a specific situation. *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail and Transp. Workers – Transp. Div.*, 973 F.3d 326, 335 (5th Cir. 2020) (quoting *Elgin*, 325 U.S. at 723) (cleaned up). In other words, minor disputes "contemplate the existence of a collective agreement already concluded," *id.* (cleaned up), and the claim central to the dispute is "to rights accrued, not merely to have new ones created for the future." *Wright*, 990 F.3d at 435 (quoting *Elgin*, 325 U.S. at 723).

To summarize, "a proposed action creates a minor dispute 'if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.'" *BNSF Ry. Co.*, 973 F.3d at 335 (quoting *Conrail*, 491 U.S. at 307). Accordingly, the proper inquiry is not who is right or wrong on the merits of the contract interpretation question, but merely whether the carrier's asserted contractual position is "arguably justified" or "frivolous." *Conrail*, 491 U.S. at 306–07. And if the dispute is capable of resolution by reference to the express or implied terms of the Parties' collective bargaining agreement (i.e., arguably justified), the actual resolution of the dispute is for the arbitrator—not this Court.

## ANALYSIS

The Court will analyze the Cross-Motions for Summary Judgment in three parts. *First*, the Court determines whether the instant dispute is either "major" or "minor" under the RLA. As explained below, the Court concludes that this dispute is minor. *Second*, the Court concludes that it is appropriate to enter a declaratory judgment that the dispute in this case is minor. *Finally*, because there is no threat of an imminent strike, the Court declines to grant injunctive relief.

BNSF's Motion for Summary Judgment will therefore be **GRANTED in part**; SMART-TD's Motion for Summary Judgment, however, will be **DENIED.**

### A. Whether BNSF Can Require Workers to Drive Company Vehicles in the Performance of their Duties is a Minor Dispute.

Despite SMART-TD's argument that BNSF is violating their obligations under the RLA, the Court concludes that BNSF's contested driving policy is "arguably justified" by the terms of the National Agreement. BNSF has therefore met the "relatively light burden" necessary to show that their actions are arguably justified such that the instant dispute is minor.

1. <u>The National Agreement's express terms—in particular, Article VIII—provide an arguable basis for BNSF's contested driving policy.</u>

BNSF's contested driving policy is "arguably justified by the [express] terms of the parties' [National Agreement]." *Id.* at 303. The instant dispute between the Parties is therefore minor.

Section 2 of Article VIII applies to road-service employees *and* speaks to their transportation. It states, in relevant part:

> When a crew is required to report for duty or is relieved from duty at a point other than the on and off duty point fixed for that assignment and such point is not within reasonable walking distance of the on and off duty point, *transportation will be provided.*

ECF No. 32 at 16 (emphasis added). Importantly, this clause neither articulates nor requires a specific mode of transportation; instead, Section 2 merely states that transportation *will be provided* in some unspecified form or fashion. *Id.* Because the plain language requires only that transportation be provided, it is undoubtedly arguable that providing a company vehicle to be driven by road-service employees can satisfy BNSF's obligations under the National Agreement.

Despite the language of Section 2, SMART-TD argues that road-service crews have never been required to drive company vehicles to or from their trains. ECF No. 31 at 4–6. Although SMART-TD may be correct regarding the past practice—which is ultimately a question for the arbitrator—the plain language of Section 2 does not require the use of third-party contractors or BNSF clerks. In fact, any argument that road-service crews *must* be driven to and from their point of duty cannot

9

be based on the plain language of the National Agreement. More to the point, if the National Agreement does not expressly *require* a specific mode of transportation for road-service employees, then it is at least *arguable* that BNSF can require road-crews to drive themselves in company-provided vehicles. Therefore, despite the past practice of utilizing third-party contractors or BNSF clerks, the plain language of Section 2 provides an arguable basis for contested driving policy.

Unlike Section 2, which applies only to road-service employees, Sections 3 and 4 of Article VIII apply to both yard- and road-service employees. Specifically, Section 3 articulates an "incidental work rule," which lists various tasks that an employee may be required to complete without additional pay. SMART-TD argues that Section 3 "clearly delineates an exclusive list of job duties that BNSF can require of its road service employees without additional compensation." *Id.* at 10. And because "[d]riving company vehicles is not included," BNSF has failed to assert an arguable basis for its contested driving policy. *Id.* When read in isolation, SMART-TD (correctly) asserts that Section 3 enumerates a list of job duties. However, SMART-TD (incorrectly) bases the assertion that the list is exhaustive "on limiting language that is not in Article [VIII]." ECF No. 40 at 9–10.

It is black-letter law that a collective bargaining agreement is not an ordinary contract. Rather, "it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *Conrail*, 491 U.S. at 311–12. As a collective bargaining agreement, the National Agreement is such a "generalized code" that governs a "myriad of cases." Further, Section 3 of this "generalized code" contains no clear limiting language. It is therefore arguable that there is other incidental work (not enumerated in Section 3) that BNSF can require both yard- and road-service employees to perform without unilaterally altering the National Agreement.

This is supported by the fact that Section 4 explicitly provides: "Nothing in this Article is intended to restrict any of the existing rights of a carrier." ECF Nos. 29 at 14; 32 at 8. By its express terms, the National Agreement thus acknowledges that BNSF maintains rights that are not restricted, unless explicitly done so by the express terms of

Article VIII. *Id.* More to the point, Section 3 does not contain any limiting language *requiring* road-service employees to be chauffeured to and from their job sites or *prohibiting* road-service employees from driving company vehicles. Accordingly, it is at least arguable that Section 3 allows the contested driving policy as a form of incidental work not enumerated in the National Agreement.

The Court thus concludes that BNSF has met the "relatively light burden" necessary to show that contested driving policy is arguably justified by the National Agreement's express terms such that the dispute is minor.

    2. <u>The National Agreement's implied terms—as interpreted through established past practice—provide an arguable basis for the contested driving policy.</u>

Even without the National Agreement's express terms, BNSF's contested driving policy is "arguably justified" by the "implied contractual terms, as interpreted through established past practice." *Gen. Comm. of Adjustment, United Transp. Union, W. Md. Ry. Co. v. CSX R.R. Corp.*, 893 F.2d 584, 591–92 (3d Cir. 1990).

Because "collective-bargaining agreements may include implied as well as express terms," a Court must consider both the express and implied provisions when determining whether an action is arguably justified by the terms of the agreement. *Conrail*, 491 U.S. at 311. To that end, the Parties' "practice, usage[,] and custom" is significant in interpreting the agreement. *Id.*; *see also Bhd. of Locomotive Eng'rs & Trainmen*, 879 F.3d at 758 ("[T]he relevant terms of an agreement are not only those that are written down; they also include the parties' past practice, usage, and custom as they carry out their agreement.").

Accordingly, "either express or implied contractual terms, as interpreted through established past practice, will serve to classify a dispute as minor." *Gen. Comm. of Adjustment*, 893 F.2d at 591–92; *see also Bhd. of Ry. Carmen (Div. of TCU) v. Atchison, Topeka & Santa Fe Ry. Co.*, 894 F.2d 1463, 1469 (5th Cir. 1990) (concluding that "claims based on implied terms—specifically, the past practices of the parties . . . —do have some arguable basis sufficient to render this a minor dispute").

11

"The type of past practice relied on need not be identical to be the challenged practice to satisfy the carriers' burden of showing arguable contractual justification." *Bhd. Ry. Carmen of U.S. & Can., Div. of Transp. Commc'ns Union v. Mo. Pac. R. Co.*, 944 F.2d 1422, 1429 (8th Cir. 1991); *see, e.g.*, *Conrail*, 491 U.S. at 315–20 (railroad's past practice of requiring drug testing as part of employee physicals only when a drug problem was known or suspected satisfied railroad's burden of showing arguable contractual justification when it began requiring routine drug screening of employees).

As expected, BNSF argues that the Parties' past practice provides an arguable basis for the contested driving policy while SMART-TD argues that it does not. Specifically, SMART-TD argues that the past practice relates solely to yard-service employees and has no applicability in the road-service-employee context. To those ends, the Parties submitted dueling affidavits as evidence of the Parties' past practice. *See* ECF Nos. 35, 38. The Court, however, is not deciding the merits of whether the past practice does in fact allow BNSF's contested driving policy. Rather, the Court is deciding only whether the evidence in the record provides an arguable basis for the contested driving policy.

Here, the Court has no reason to doubt the veracity of the affidavits of either Party. Further, the affidavits—arguing over whether the Parties' past practice gives rise to an implied term applicable to road-service employees—demonstrate that the heart of the dispute is over whether a right has accrued based on the Parties' past practice, not whether a new right is being created for the future. *See Conrail*, 491 U.S. at 303. And while it is indeed arguable that the past practice specific to yard-service employees does not establish an implied term that supports the contested driving policy, the opposite is also arguable.

In sum, resolution of the instant dispute will turn on the application or interpretation of the express or implied terms of Article VIII of the National Agreement—i.e., the instant dispute is comprehended within an *existing* agreement between the Parties. The Court therefore concludes that BNSF has met the "relatively light burden" of establishing that this dispute is minor under the RLA.

### B. A Declaratory Judgment That the Instant Dispute is a Minor Dispute is Appropriate.

Because the Parties' dispute is neither conjectural nor hypothetical, the Court concludes that it is appropriate to enter a declaratory judgment that the dispute is minor. *See, e.g.*, *BNSF Ry. Co. v. Int'l Assoc. of Sheet Metal, Air, Rail and Transp. Workers – Transp. Div.*, No. 3:15-CV-1029-M, 2016 WL 1242627, at *3 (N.D. Tex. Mar. 30, 2016) ("In the Fifth Circuit, the issue of whether a dispute between a railroad carrier and an employee union is properly classified under the RLA as a major or minor dispute is clearly a controversy subject to resolution under the Declaratory Judgment Act.").

To start, there is a genuine dispute as to whether BNSF's actions are arguably justified by the Parties' National Agreement. And which dispute-resolution procedures are available to the Parties can be determined only by classifying this dispute as either major or minor. Thus, "given the nature of dispute-resolution proceedings under the RLA, the Parties would suffer hardship should the Court withhold consideration." *BNSF Ry. Co. v. Bhd. of Locomotive Eng'rs & Trainmen*, 595 F. Supp. 2d 722, 735 (N.D. Tex. 2008), *aff'd sub nom.*, *BNSF Ry. Co. v. United Transp. Union*, 337 F. App'x 409 (5th Cir. 2009). Accordingly, a judicial decision by this Court will allow the Parties to properly resolve the instant dispute pursuant to the RLA. BNSF's Motion will thus be **GRANTED in part** to the extent that it seeks a declaratory judgment that this dispute is "minor" under the RLA.

### C. Injunctive Relief is Not Appropriate.

Although the Court concludes that it is appropriate to enter a declaratory judgment, it declines to grant injunctive relief. The record before the Court does not establish an immediate threat of a strike. While SMART-TD has yet to give assurances that it agrees that the instant dispute is a minor dispute, it has also failed to make credible representations that the union-represented employees plan to strike over the dispute. Merely taking the position that the dispute is major should not be equated with the threat of a strike. Rather, SMART-TD's litigation position should be viewed in the context of the RLA, which

13

encourages hard bargaining. *See, e.g., Fed. Exp. Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 964–65 (D.C. Cir. 1995) ("Employers and unions can be expected to take aggressive bargaining positions and freely threaten dire consequences when they are rejected."). BNSF's Motion will thus be **DENIED in part** to the extent that it seeks injunctive relief.

## ORDER

As explained above, the Court concludes that the instant dispute can be resolved by interpreting the Parties' 1985 National Agreement—i.e., BNSF's contested driving policy is "arguably justified" by the express or implied terms of the National Agreement. Accordingly, the Court concludes that the instant dispute between the Parties is a minor dispute subject to the mandatory arbitration provisions of the RLA.

Accordingly, the Court **ORDERS** that BNSF's Motion for Summary Judgment is **GRANTED in part** to the extent that it seeks a declaratory judgment that this dispute is "minor" under the Railway Labor Act.

The Court further **ORDERS** that BNSF's Motion for Summary Judgment is **DENIED in part** to the extent that it seeks injunctive relief.

The Court further **ORDERS** that SMART-TD's Motion for Summary Judgment is **DENIED.**

**SO ORDERED** on this **14th day** of **January, 2022.**

_____
Mark T. Pittman
UNITED STATES DISTRICT JUDGE